UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LEON WILSON,

                Petitioner,                        Hon. Gordon J. Quist

v.                                            Case No. 1:08-CV-752

MARY BERGHUIS,

                Respondent.
_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Wilson's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Wilson's petition be **denied**.


## BACKGROUND

As a result of events that occurred on or about June 23, 2002, Petitioner was charged with open murder. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.


**Thomas McCarthy**

As of June 23, 2002, McCarthy was employed as a police officer with the Grand

Rapids Police Department. (Trial Transcript, January 6, 2004, 60-61). At approximately 11:30 p.m. that evening, McCarthy and his partner were dispatched to the 800 block of Neland Avenue to investigate a vehicle fire. (Tr. 61-62). McCarthy was also informed that a person might be trapped inside the vehicle. (Tr. 62). As he approached the area, Officer McCarthy observed a Bronco "parked in front of 814 Neland" that was "completely engulfed in flames." (Tr. 62).

McCarthy was unable to get near the burning vehicle because it was "completely engulfed" in flames, but "it didn't appear anyone was inside." (Tr. 63). Officer McCarthy then heard someone yell, "hey, over here." (Tr. 63). McCarthy ran to the location and observed a female who was "completely naked and was still smoking." (Tr. 63-66). As Officer McCarthy described the woman's condition:

> Her entire body was burned. Her hair and her head and her pubic hair was still smoking, her body was smoking. For lack of a better term, there was skin dripping off her body on to the end of the driveway."

(Tr. 63-64).

Officer McCarthy attempted to comfort the woman until paramedics arrived. (Tr. 64-65). Once the paramedics arrived, McCarthy asked Petitioner what had occurred. (Tr. 66-68). Petitioner reported that the victim, Ladena, had contacted him to report that her vehicle was out of gas. (Tr. 68). According to Petitioner, he and Ladena rode in Petitioner's vehicle to a gas station where Ladena filled a container with five dollars worth of gas. (Tr. 68). Petitioner stated that Ladena then reentered his vehicle and placed the gas cannister between her legs, at which point Petitioner returned to Neland Avenue. (Tr. 68-69). According to Petitioner, when he arrived at the location on Neland, he exited the vehicle. (Tr. 69). Petitioner reported that Ladena then began smoking a cigarette which caused "a huge fire." (Tr. 69-70). According to Petitioner, Ladena then

exited the vehicle, at which point he "rolled her on the ground to put the flames out."  (Tr. 70).


**David VanHolstyn**

As of June 23, 2002, VanHolstyn was employed as a lieutenant for the Grand Rapids Fire Department.  (Trial Transcript, January 6, 2004, 82-83).  At approximately 11:30 p.m. that evening, VanHolstyn's company was dispatched to the 800 block of Neland Avenue.  (Tr. 83).  When VanHolstyn's company arrived at the scene, another fire company, as well as several police cars, had already arrived.  (Tr. 83-84).  VanHolstyn assisted in the effort to extinguish the fire and treat the victim.  (Tr. 84-92).  VanHolstyn then contacted fire investigator, Pablo Martinez.  (Tr. 89).


**Lou Houtman**

As of June 23, 2002, Houtman was employed as a firefighter for the Grand Rapids Fire Department.  (Trial Transcript, January 7, 2004, 8-9).  Houtman indicated that he had been a firefighter for more than 13 years.  (Tr. 8).  At approximately 11:30 p.m. that evening, Houtman responded to a vehicle fire in the 800 block of Neland Avenue.  (Tr. 9).  Houtman indicated that the fire was difficult to extinguish.  (Tr. 10-16).  In this respect, Houtman testified:

> It was a stubborn fire, which means you spray it in one area and you move to another area and the first area flares back up.  That's not always the case.  A stubborn fire like that to me usually indicates there's been an accelerant used, especially in a vehicle fire.  We've gone to a lot of vehicle fires, and typically the ones that are stolen vehicles, if there's a[n] accelerant used, it's more of a stubborn fire.

(Tr. 16).

**Richard Clark**

As of June 23, 2002, Clark was employed as a firefighter for the Grand Rapids Fire Department. (Trial Transcript, January 7, 2004, 21-22). At approximately 11:30 p.m. that evening, Clark was dispatched to the 800 block of Neland Avenue in response to a vehicle fire. (Tr. 22-23). When he arrived at the scene, Clark attempted to help the victim until paramedics arrived. (Tr. 24-32).

**Fredrick Thomas**

As of June 23, 2002, Thomas resided at 819 Neland Avenue. (Trial Transcript, January 7, 2004, 35). At approximately 8:30 p.m. that evening, Thomas was sitting on his porch when he observed a man and a woman arguing across the street. (Tr. 35-46). The man was driving an SUV and the woman "asked him to take her to get some gas." (Tr. 37). The argument "got louder and louder" and the woman accused the man of "being with" another girl. (Tr. 37-39, 49). The woman also struck the man's truck with a crowbar. (Tr. 44, 55-56). The woman again told the man "she needed some gas" because "her car wouldn't start." (Tr. 41, 46). The pair departed and returned approximately 20 minutes later, at which point they resumed arguing. (Tr. 46, 51-52). Specifically, Thomas witnessed the pair "fussing in the SUV." (Tr. 46). Immediately thereafter, Thomas witnessed an explosion, immediately after which "he gets out and she jumps out and said he set me on fire." (Tr. 46). The woman then began running around "hollering":

> Please, somebody help me. He set me on fire. Please somebody help me. He set me on fire.

(Tr. 47).

Immediately after the explosion, Thomas looked inside the SUV and saw a gas can sitting between the front seats. (Tr. 47).

**Robert Baskin**

As of June 23, 2002, Baskin resided at 824 Dallas Avenue. (Trial Transcript, January 7, 2004, 58-59). That evening Baskin was sitting in his bedroom, which overlooks Neland Avenue, with his windows open. (Tr. 59-61). During the course of the evening, Baskin overheard a loud argument outside between a man and a woman. (Tr. 61-62). Later that evening, Baskin heard an explosion, immediately after which a woman began yelling, "help me, help me, he set me on fire, he set me on fire." (Tr. 62-67). When Baskin looked out of his window he saw that the woman "was ablaze, really, really ablaze." (Tr. 62-63). Baskin reported that:

> She was really - the flames were like 40 feet in the air, 30, 40 feet in the air. She was burning the tree limbs above her. That's how much gasoline was on her.

(Tr. 65).

**Joseph Carter**

On the evening of June 23, 2002, Carter was riding his bicycle on Neland Avenue when he passed a man and a woman who were arguing. (Trial Transcript, January 7, 2004, 88-92). Later that evening, Carter "heard a big boom" at which point he "ran up on Neland" where he observed "a lady was on fire." (Tr. 92-93).

**Arthur Williams**

On the evening of June 23, 2002, as Williams drove past Neland Avenue he saw a vehicle on fire. (Trial Transcript, January 7, 2004, 99-100). Williams saw a lady that had exited the vehicle and was on fire. (Tr. 100-01). Williams used his fire extinguisher to try "to put her out." (Tr. 101). Williams "sprayed her down. . .but, by that time, [her] skin and clothes had started falling off her body." (Tr. 101). Williams did not see anybody else trying to help the woman. (Tr. 103).

**Helene Wilson**

Helene Wilson is the mother of the victim, Ladena Wilson. (Trial Transcript, January 8, 2004, 19). On the evening of June 23, 2002, Wilson learned that her daughter and Petitioner were in a local hospital. (Tr. 21-22). After arriving at the hospital, Wilson was unable to see her daughter, so she asked Petitioner what happened. (Tr. 24-27). Petitioner initially responded, "this is all my fault." (Tr. 25-26). When asked to elaborate, Petitioner responded, "I don't know, maybe if I hadn't left her." (Tr. 26). Later, Petitioner stated, "she did this to herself." (Tr. 26-27). When Wilson asked Petitioner what he meant, Petitioner responded, "she poured gasoline on herself and lit a cigarette." (Tr. 27).

On a subsequent occasion, Wilson asked Petitioner, "if she poured gasoline on herself, why didn't you snatch her out of the car or something?" (Tr. 30). Petitioner responded that they were arguing and he "didn't think she was going to do anything." (Tr. 30). According to Petitioner, Ladena stated, "you might as well take the kids because after this you're going to get them anyway, and then she pulled out a cigarette and lit it." (Tr. 31). Wilson then asked Petitioner, "you mean there was time? You just sat there and let her light a cigarette with gasoline on her?" (Tr. 31-

6

32).  Petitioner responded, "yeah."  (Tr. 32).

**Lavette Hoye**

Lavette Hoye is Ladena Wilson's older sister.  (Trial Transcript, January 8, 2004, 38-39).  Hoye purchased a white Ford vehicle for Ladena, approximately one month before her death.  (Tr. 41).  Prior to her death, Ladena Wilson resided with her two children at 1669 Bradford.  (Tr. 40-41).  Petitioner did not reside at this location prior to Ladena's death.  (Tr. 47).  After Ladena's death, however, Petitioner began residing at 1669 Bradford with several other people.  (Tr. 47-48).

**Willie Martin**

As of June 23, 2002, Martin resided at 808 Neland Avenue.  (Trial Transcript, January 8, 2004, 49).  That evening, while he was watching television, Martin "heard a loud explosion next door."  (Tr. 49-50).  When Martin looked outside he saw a white Bronco "in flames" and a "young lady. . .on flame by the tree."  (Tr. 50).  Martin rushed outside to help the woman, who kept telling him, "he set me on fire, he set me on fire."  (Tr. 50-51).  The woman also stated, "he threw the gas on me and lit it."  (Tr. 52).

**Arthur Thomas**

On the evening of June 23, 2002, Thomas exited Ms. Tracy's, a store located on Neland Avenue.  (Trial Transcript, January 8, 2004, 77).  When he did so, he observed a man and a woman sitting inside a Bronco fighting.  (Tr. 77-78).  The man and woman departed the area and returned approximately 15 minutes later.  (Tr. 78).  Upon their return, the man and woman began

fighting again. (Tr. 78). During this fight, the man was "hitting [the woman] in the face. . .with his fists." (Tr. 79-80). Thomas went to telephone the police to break up the fight, however, by the time he returned to the area, the Bronco was on fire. (Tr. 79-80). Thomas identified Petitioner as the man who was hitting the woman inside the Bronco. (Tr. 82).

**Dana Patterson**

On the evening of June 23, 2002, Patterson was visiting her father, Willie Martin, at 808 Neland Avenue. (Trial Transcript, January 8, 2004, 50, 89-90). That evening, as she was looking outside, Patterson saw a woman stop her car in front of the house. (Tr. 90). A Bronco immediately parked behind the car. (Tr. 90-91). A man exited the Bronco and began arguing with the woman. (Tr. 90). The pair then entered the Bronco and continued fighting. (Tr. 90). The man was "hitting, choking, [and] punching" the woman. (Tr. 90). The pair soon departed in the Bronco. (Tr. 91-92). The man and woman returned a short time later, after which she looked outside and saw "everything was on fire." (Tr. 93). Patterson heard the woman yell, "he put me on fire." (Tr. 96).

**Pablo Martinez**

As of June 23, 2002, Martinez was employed as a fire investigator with the Grand Rapids Fire Department. (Trial Transcript, January 9, 2004, 9-10). Late that evening, Martinez was dispatched to the 800 block of Neland Avenue to investigate a vehicle fire involving a Bronco. (Tr. 10-11). After examining the scene of the fire, Martinez went to the hospital and spoke with Petitioner. (Tr. 12-17).

Petitioner told Martinez that earlier that evening, Ladena "called him to tell him she

had run out of gas." (Tr. 17-18). Petitioner indicated that he took Ladena to a gas station where she pumped five or six dollars worth of gas into a plastic five-gallon gas can after which they returned to Ladena's vehicle. (Tr. 18). According to Petitioner, "as he was getting out of the car. . .[Ladena] yelled that she was on fire." (Tr. 18). Petitioner stated that he tried to help Ladena, but "by the time he got to her door. . .her clothes were on fire." (Tr. 18). Petitioner told Martinez that Ladena had been smoking a cigarette immediately prior to the fire. (Tr. 18-19). When Martinez asked Petitioner "if he was sure," Petitioner responded, "no," but that he had simply "assumed" that she was smoking a cigarette. (Tr. 19). When Martinez asked Petitioner if Ladena had been smoking a cigarette on the way to or from the gas station, Petitioner responded, "no." (Tr. 19). Martinez then asked Petitioner if her saw "her light one when you got back to the car," to which Petitioner responded, "no, but I - she must have been smoking a cigarette." (Tr. 19). Petitioner then began crying and said "he was sorry that she had died and that it was all his fault, and that he was sorry that they had been fighting." (Tr. 19).

Martinez recovered the t-shirt Petitioner had been wearing, as well as Ladena's clothing, and submitted it to a laboratory for testing. (Tr. 20-36). Martinez also recovered the gas container from the Bronco and submitted it to a laboratory for testing. (Tr. 21-36). An examination of the Bronco revealed that its gas tank was intact and had not exploded. (Tr. 37).

**Kevin Streeter**

As of June 25, 2002, Streeter was employed as a forensic scientist for the Michigan State Police. (Trial Transcript, January 9, 2004, 38-41). On that date, Streeter received from Pablo Martinez a gas can and five items of clothing (a t-shirt, a robe, two items of burnt clothing, and a pair

9

of black pants) for analysis.  (Tr. 41).  The t-shirt and robe did not reveal the presence of any identifiable liquid petroleum products, but the other items of clothing all tested positive for the presence of gasoline.  (Tr. 41-44).  Streeter also analyzed several items from the Bronco's interior. (Tr. 44-45).  The right rear floorboard area, front passenger seat padding, and front passenger area carpet padding all tested positive for the presence of gasoline.  (Tr. 45-46).

**Shabona Banks**

In the early evening of June 23, 2002, Petitioner went to Banks' residence.  (Trial Transcript, January 9, 2004, 47-52).  She and Petitioner talked for a period of time, during which Petitioner stated that Ladena "was keeping the kids from him."  (Tr. 52-55).  During their conversation, Petitioner offered Banks one of his cigarettes.  (Tr. 53).  Banks accepted a cigarette, which she lit using Petitioner's lighter.  (Tr. 53-54).  After Banks took her cigarette, there were still seven or eight cigarettes in the pack.  (Tr. 54).

**Denise Banks**

On the evening of June 23, 2002, Petitioner, after visiting with Shabona Banks, went to Denise Banks' residence.  (Trial Transcript, January 9, 2004, 60-61).  Petitioner told Banks that Ladena "wanted to move to another state and that she wanted to take the kids."  (Tr. 62).  Petitioner told Banks that "he didn't care if she moved, but he didn't want her to take the kids."  (Tr. 63). During his visit, Petitioner did not smoke any cigarettes.  (Tr. 63).

**Shernette Johnson**

On June 21, 2002, Ladena left her kids with Johnson. (Trial Transcript, January 9, 2004, 74-75). On June 23, 2002, Johnson telephoned Petitioner and asked him to "come and get the kids." (Tr. 75-76). Petitioner told Johnson to tell the police that Ladena had abandoned the kids so that he could get custody. (Tr. 76-79). Johnson refused. (Tr. 77).

**Gregory Stormzand**

As of July 1, 2002, Stormzand was employed as a fire investigator with the Michigan State Police. (Trial Transcript, January 12, 2004, 3-5). On that date, Detective Erik Boillat contacted Stormzand, requesting his assistance in a fire investigation. (Tr. 5). Because gas and cigarettes were allegedly involved in producing the fire in question, Stromzand conducted a series of "test burns using cigarettes, gasoline, matches, [and] clothing." (Tr. 14-15).

In one test, Stormzand poured gas into a cup, which he then attempted to ignite using a cigarette. (Tr. 15). The cigarette was placed "a couple inches away from it and then right in to it, and it would not ignite." (Tr. 15-16). Stromzand then attempted to ignite the gasoline by moving a match towards the cup. (Tr. 16). The gas vapors did ignite, but diminished "rather quick[ly]." (Tr. 16). Stormzand then poured gas on a t-shirt, which he then attempted to ignite using a cigarette. (Tr. 16). When the cigarette was placed "by" the t-shirt, "nothing happened." (Tr. 16). When the cigarette was placed "on" the t-shirt, "it kind of smoldered inside the t-shirt never igniting an open flame." (Tr. 16). However, when a lighted match was moved "toward" the t-shirt, the t-shirt "ignited." (Tr. 16).

**Dr. Stephen Cohle**

In June 2002, Dr. Cohle, a forensic pathologist, performed an autopsy on Ladena Wilson. (Trial Transcript, January 12, 2004, 26-29). Based on the soot present in Wilson's airway, Dr. Cohle determined that Wilson was alive at the time of the fire. (Tr. 32-33). The doctor discovered no evidence that Wilson had been suffering any "natural disease" or "other condition" that contributed to her death. (Tr. 32). Dr. Cohle concluded that Wilson died from "medical complications of the burns she received." (Tr. 35-36). After reviewing the results of the investigations conducted by police and fire officials, Dr. Cohle characterized Wilson's death as a homicide. (Tr. 36-37).

**Dr. Richard Wilcox**

Dr. Wilcox testified as an expert in the area of "burn injuries." (Trial Transcript, January 12, 2004, 48-50). The doctor testified that human skin is not naturally flammable, thus it "won't flame up unless you have some accelerant on the skin such as gasoline, kerosene, lighter fluid, racing fuel." (Tr. 52). Dr. Wilcox testified that, absent an accelerant, clothing will ignite only when exposed to "extremely intense heat." (Tr. 52). The doctor stated that if a person was "fully engulfed in flames," he would expect such to result from the use of an accelerant. (Tr. 53).

Dr. Wilcox testified that Ladena Wilson suffered "pretty uniform head to toe, full thickness burns." (Tr. 60-61). The doctor indicated that it would have taken a "fair amount" of accelerant, covering "a large part of her body," to produce Wilson's injuries. (Tr. 60-61). Dr. Wilcox testified that given "the extent of the burns all the way to the top of her scalp," it was "likely that [Wilson] had accelerant on her head, too." (Tr. 61).

Dr. Wilcox also testified that Petitioner suffered "relatively superficial or shallow, partial thickness burns to part of his face," as well as "deeper partial thickness burns involving both of his upper extremities." (Tr. 62). The doctor characterized Petitioner's injuries as "a flash burn," which he described as "a common pattern in people trying to get their brush fires better and throw a little gasoline on it and hit it with a match and get a flashback." (Tr. 62-63). Dr. Wilcox also testified that Petitioner's burns were not consistent with him sitting in the vehicle's driver's seat, but instead were consistent with Petitioner facing towards Wilson. (Tr. 64-65).

**Erik Boillat**

As of June 24, 2002, Boillat was employed a Detective with the Grand Rapids Police Department. (Trial Transcript, January 12, 2004, 74-75). On that date, Boillat was assigned to investigate the incident that resulted in Ladena Wilson's death. (Tr. 75). Later that day, Boillat spoke with Petitioner.[1] (Tr. 79).

After investigation revealed the presence of gasoline on Ladena Wilson's clothing, a fact that was inconsistent with Petitioner's previous statements, Boillat again interviewed Petitioner on July 15, 2004.[2] (Tr. 7-9). During this interview, Petitioner for the first time asserted that Wilson allegedly splashed herself with gas. (Tr. 12-13). Petitioner asserted that Wilson poured gas on herself and then placed the gas can "back on the floor" of the vehicle. (Tr. 14-15). Subsequent investigation, however, revealed the presence of glass on the underside of the gas can,

---

[1] This interview was recorded and played for the jury. (Trial Transcript, January 12, 2004, 80-88; Trial Transcript, January 13, 2005, 3). The record does not, however, contain a transcript of the recording.

[2] This interview was recorded and played for the jury. (Trial Transcript, January 13, 2005, 8-12). The record does not, however, contain a transcript of the recording.

which was inconsistent with the gas can sitting on the floor of the vehicle when the fire began. (Tr. 14-15). Petitioner was again interviewed on July 18, 2004.[3] (Tr. 14). Petitioner was arrested on March 7, 2003, after which he waived his Miranda rights and made a statement.[4] (Tr. 22-26).

**Julie Chan**

As of June 24, 2002, Chan was employed as a crime scene technician with the Grand Rapids Police Department. (Trial Transcript, January 13, 2004, 39-40). That morning, Chan investigated the scene of the previous night's fire. (Tr. 40). As part of her investigation, Chan collected certain items of evidence, including two Bic lighters. (Tr. 40-43).

**Mike Marquardt**

As of July 8, 2002, Marquardt was employed as a Certified Fire Investigator with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). (Trial Transcript, January 13, 2004, 46-58; Trial Transcript, January 14, 2004, 7-8). Marquardt was qualified to testify as an expert in the field of fire investigation. (Trial Transcript, January 13, 2004, 58).

On July 8, 2002, Marquardt was asked to "take a look at" Petitioner's vehicle. (Trial Transcript, January 14, 2004, 7-8). Over the course of the next 15 months, Marquardt examined Petitioner's vehicle "at least six to seven times," performed certain tests and examinations, and examined all the evidence and witness statements. (Tr. 8). As a result of his expertise and

---

[3] This interview was recorded and played for the jury. (Trial Transcript, January 13, 2005, 16-17). The record does not, however, contain a transcript of the recording.

[4] This statement was recorded and played for the jury. (Trial Transcript, January 13, 2005, 24-25). The record does not, however, contain a transcript of the recording.

14

examination, Marquardt concluded that the fire in question "started with the distribution of gasoline and an open flame." (Tr. 8-9). Marquardt determined that gas "was distributed on the victim Ladena Wilson and in the area of the of the right front passenger compartment and ignited with an open flame." (Tr. 9). Marquardt further determined that the gas "was distributed from the driver's side console area, from the left of the passenger seat." (Tr. 101).

Marquardt testified that based on the damage to the gas can, it was not on the passenger floor board during the fire, but instead was sitting "on the plastic console between the seats." (Tr. 48-71). As for the amount of gas that was poured on Ladena Wilson, Marquardt concluded that "it had to be a significant quantity" given the nature of Wilson's burns, as well as the fact that her clothes still tested positive for the presence of gas following the fire. (Tr. 69-70). Marquardt testified that after Wilson was doused with gas, a person "definitely" could "light her" with a Bic lighter. (Tr. 91-92).

Marquardt testified that there was no evidence that a mechanical or electrical failure contributed to the fire. (Tr. 73-74). Marquardt further testified that there was no evidence that the vehicle's gas line or gas tank contributed to the fire. (Tr. 74-75). With respect to Petitioner's assertion that "a cigarette ignited vapors from this gas can," Marquardt concluded that "it could not have" occurred as Petitioner alleged because "a cigarette is not a competent ignition source for gasoline vapors." (Tr. 77). As for Petitioner's statement that he first saw Wilson's hand ignite only after which she was engulfed in flames, Marquardt stated that such statement is inconsistent with how "fire works" with an ignitable liquid such as gasoline. (Tr. 100-01).

**Mischa Phillips**

Phillips testified that she had been married to Petitioner "almost ten years ago." (Trial Transcript, January 15, 2004, 6). Sometime after Ladena Wilson's death, Phillips spoke with Petitioner. (Tr. 6-7). When Phillips asked Petitioner how he got burned, Petitioner stated "the crazy bitch poured gas on me." (Tr. 7).

**John DeHaan**

DeHaan testified that he has worked as a criminalist for 32 years and earned a doctorate degree for research in the reconstruction of fires involving highly flammable liquids. (Trial Transcript, January 15, 2004, 10-11). DeHaan was qualified to testify as an expert in the area of fire and explosion investigation. (Tr. 11-14). In November 2002, DeHaan was asked to review and evaluate the evidence. (Tr. 14-15).

DeHaan noted that gasoline was discovered on the victim's clothing. (Tr. 16-23). DeHaan further observed that the condition of the victim's clothing was "not consistent with normal, unaided combustion but, rather, combustion aided by some sort of ignitable liquid." (Tr. 23). DeHaan concluded that "a considerable quantity of gasoline had to be spread on the victim to get her clothing involved to the point it was observed by witnesses as well as the interior of the vehicle, which would seem to be well involved as stated by witnesses very quickly on." (Tr. 54). DeHaan also examined Petitioner's clothing and found that its condition was inconsistent with Petitioner's statement that he "grabbed the victim and tried to put her out and roll her on the ground." (Tr. 19-22).

DeHaan examined Petitioner's medical records and concluded that his injuries were consistent with someone "leaning over with an ignition source like a match or cigarette lighter clenched in their hand and [who] come[s] in contact with ignitable vapors, and the flash from the ignitable vapors damage the exposed portion of the hand, the back of the hand, and the underside of the hand if they're close to a pool of liquid, and sparing the palm of the hand because it's clenched around the ignition source." (Tr. 26-27).

DeHaan also examined the two lighters recovered from the scene and concluded that the damage to one of them was consistent with having been "exposed to the heat from either the radiant heat from the burning vehicle or localized heat from the charring grass." (Tr. 28-30). DeHaan further noted that the precise location from which this particular lighter was recovered was consistent with the statements of several witnesses that "an individual exited the driver's side and ran around the back" of the burning vehicle. (Tr. 30).

DeHaan examined the evidence from the interior of the vehicle and determined that "based on the damage to the [gas] can, it had to have been on the console of the vehicle and, as it's affected by the fire in the vehicle, it melts, slumps over, and falls in to the foot well of the vehicle, which is where it was ultimately found." (Tr. 54). In reaching this conclusion, DeHaan noted that the gas can was discovered *on top* of the windshield. (Tr. 54). As DeHaan observed, "that means that the can didn't come in to that final position of the floor until after the windshield has collapsed on the floor and the can slumped over on top of it." (Tr. 55).

DeHaan concluded that "the fire was deliberate in its ignition and the fuel first ignited was gasoline that had been poured or thrown on to the victim intentionally." (Tr. 16).

**Belinda Thomas**

On the morning of June 23, 2002, Ladena Wilson went to Thomas' residence. (Trial Transcript, January 15, 2004, 63-64). Wilson appeared "anxious" and "troubled." (Tr. 66). She "had her stuff in the back seat" of her car and "was leaving." (Tr. 65). Later that evening, Petitioner went to Thomas' residence. (Tr. 67). Petitioner was "enraged" and told Thomas, "don't fucking lie to me. Where's Ladena at?" (Tr. 67). Petitioner then stated, "tell that bitch she ain't going to ever see her kids again" and departed. (Tr. 68-69).

**Cheryl Huberts**

As of June 23, 2002, Huberts was employed as an emergency room nurse. (Trial Transcript, January 15, 2004, 75-76). Huberts treated Ladena Wilson when she arrived at the hospital that evening. (Tr. 76). When Wilson arrived she was alert and responsive to questions. (Tr. 76-78). As Wilson was being treated, Huberts asked her "is there anything you want me to say to anybody?," to which Wilson responded, "tell her babies that she loved them and that their daddy did this to her." (Tr. 78).

Following the presentation of evidence, the jury found Petitioner guilty of second degree murder. (Trial Transcript, January 20, 2004, 3). Petitioner was sentenced to life in prison. (Sentence Transcript, April 15, 2004, 14). Petitioner appealed his conviction in the Michigan Court of Appeals, asserting the following claims:

   I.    There was insufficient evidence to sustain the verdict
         of second degree murder.

   II.   The trial court reversibly erred in admitting the
         hearsay statements of decedent Ladena Wilson and

the Defendant through Fredrick Thomas, Robert
Baskin, Willie Martin, and Cheryl Huberts, depriving
Defendant of a fair trial.

III.    The Defendant's sentence of life in prison was
disproportionately high and an abuse of discretion.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Wilson,* 2005 WL 2291873 (Mich. Ct. App., Sept. 20, 2005). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Wilson,* No. 129728, Order (Mich., Jan. 30, 2006). On August 11, 2008, Petitioner initiated the present action in which he asserts the three claims identified above.

## STANDARD OF REVIEW

Wilson's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court
shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless
the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of
the United States, or

(2)    resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court

unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the

state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.          **Sufficiency of the Evidence**

Petitioner asserts that he is entitled to habeas relief on the ground that the prosecution failed to present sufficient evidence to sustain a conviction for second degree murder.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor

of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Under Michigan law in effect as of the date Petitioner acted, the elements of second degree murder were: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *See People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996) (citing *People v. Dykhouse*, 345 N.W.2d 150 (Mich. 1984)). Malice is defined as "the intent to kill, an intent to inflict great bodily harm, or the wanton and wilful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm." *People v. Hopson*, 444 N.W.2d 167, 169 (Mich. Ct. App. 1989). Malice may be inferred "from the facts and circumstances of the killing," *People v. Kemp*, 508 N.W.2d 184, 187 (Mich. Ct. App. 1993), including "evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980).

As discussed above, the prosecution introduced an *overwhelming* amount of evidence, which if viewed in a light most favorable to the prosecution, more than established Petitioner's guilt. Belinda Thomas testified that on the evening in question, Petitioner was enraged and asserted that Ladena Wilson "ain't going to ever see her kids again." Several witnesses testified that Petitioner and Wilson were arguing prior to the fire. Several witnesses testified that immediately after the fire, Wilson stated that Petitioner had set her on fire. Petitioner made conflicting statements concerning the incident none of which were consistent with the forensic evidence, which revealed that Petitioner doused Ladena Wilson with gasoline and intentionally set her on fire.

As the Michigan Court of Appeals concluded, "[m]uch of defendant's argument focuses on a lack of credibility as to particular witnesses or points to conflicting evidence, neither

of which warrant reversal in the context of a sufficiency argument. In sum, there was sufficient evidence to convict defendant of second-degree murder." *Wilson,* 2005 WL 2291873 at *2 (internal citation omitted). This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

II.          **Evidentiary Claims**

As discussed below, Petitioner has advanced three distinct claims concerning evidence that was admitted at trial.

A.          Statements attributed to Petitioner

Petitioner first objects to certain testimony by Robert Baskin and Cheryl Huberts who, according to Petitioner, "attributed inculpatory statements to the Petitioner."

As noted above, Baskin testified that on the evening of June 23, 2002, he overheard a loud argument between a man and a woman. (Trial Transcript, January 7, 2004, 61-62). Baskin further stated that during this argument he "heard someone say don't put your hands on me, you have no right to put your hands on me. I heard a male voice yelling to her to get in the car." (Tr. 61).

As previously noted, Huberts testified that she treated Ladena Wilson when she arrived at the hospital following the fire. As Wilson was being treated, Huberts asked her "is there anything you want me to say to anybody?," to which Wilson responded, "tell her babies that she loved them and that their daddy did this to her." (Trial Transcript, January 15, 2004, 78). Following

this testimony, the following exchange occurred between the prosecutor and Huberts:

Q:      What happened next?

A:      We gave her sedation medication and put her to sleep and we put her on the ventilator, burn unit doctor came down and assessed her prior to taking her to the floor.  The gentleman that was in room two, who had had arm burns - - two and three are next to each other with a curtain in between.  [I opened] that curtain up. I walk over to his bedside and said to him would you like to say good-bye to her, I need to get her upstairs in the tub.  And the tub is where they scrub the patient down and wrap them.  That's up in the burn unit.

And he said yes.  And I took his arm and walked to her bedside, and I remember him grabbing the railing on the bed, and I can't tell you if he grabbed it with two hands or one hand because I know he had burns on both arms and hands.  And he said to her, baby, I love you, I'm so sorry I did this to you.

I did not think anything of it at that time.  Walked him back to his bed, and I took her up to the burn unit with the respiratory therapist because they have to accompany us to help with the airway.

Q:      Did you ever see her alive again?

A:      No.

Q:      Did you have any other contact with him?

A:      No.

Ms. Koncki:    Nothing further - - I'm sorry.

By Ms. Koncki:

Q:      Would you recognize the person that made the statements to Ladena Wilson?

A:      I can't say I would recognize his face one hundred

> percent, but I can tell you that it was the gentleman
> that was in room two in the trauma room that same
> night that was with her when the burns happened and
> he received arm burns.  I was not his primary nurse;
> I was hers.
>
> Q:      What was your understanding as to who this person
>         was in relation to that patient?
>
> A:      Significant other, Michigan common law husband,
>         which I know doesn't exist, but they had children
>         together.
>
> Q:      That was your understanding at the hospital?
>
> A:      Yes, it was.  That is why I walked him to her bedside.
>
> Q:      Look around the courtroom and tell me if you're able
>         to recognize the person or not.  If you're not, just tell
>         me.
>
> A:      I can't say that I can.  Sorry.

(Trial Transcript, January 15, 2004, 78-80).

Petitioner asserts that the admission of this testimony was improper as it was "highly unreliable."  Petitioner raised this claim in state court, but it was not addressed on the merits. Accordingly, the Court evaluates this particular claim de novo.  *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer"); *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

Generally, errors by a state court on matters involving the admission or exclusion of

evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, require a "perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

Petitioner did not object to the admission of this testimony at trial and the Michigan Court of Appeals did not address the merits of this particular claim. Thus, this Court is without the benefit of either state court's insight on the matter. Even if the Court assumes that the testimony in question was improperly admitted as a matter of Michigan evidentiary law, such does not merit the relief sought. Baskin's comment was consistent with and cumulative to other testimony to which

Petitioner does not object. Fredrick Thomas, Joseph Carter, Arthur Thomas, and Dana Patterson all testified that they saw a man and woman arguing in the street prior to the fire. Huberts' testimony was likewise consistent with and cumulative to the testimony of Pablo Martinez that Petitioner told him that "it was all his fault, and that he was sorry that they had been fighting." In sum, the admission of this evidence was not fundamentally unfair and did not deprive Petitioner of a fair trial.

### B. Statements made by Ladena Wilson

As discussed above, several individuals (Fredrick Thomas, Robert Baskin, Willie Martin, and Cheryl Huberts) all testified as to statements by Ladena Wilson identifying Petitioner as the person who set her on fire. Petitioner asserts that his right to a fair trial was violated by the admission of this hearsay testimony.

As discussed in the preceding section, errors by a state court on matters involving the admission of evidence cannot form the basis for habeas relief unless Petitioner demonstrates that admission of the evidence in question was so egregious that denied him the right to a fair trial. Petitioner can make no such showing.

The evidence in question was admissible pursuant to well-recognized exceptions to the general rule against the admission of hearsay statements. As the Michigan Court of Appeals concluded, the statements by Ladena Wilson to Fredrick Thomas, Robert Baskin, and Willie Martin were all admissible as excited utterances. *Wilson,* 2005 WL 2291873 at *2-3. As the court further recognized, Wilson's statement to Cheryl Huberts was admissible as a dying declaration. *Id.* at *2-4. Petitioner has failed to demonstrate that the admission of this testimony violated his right to a fair trial or was fundamentally unfair. Moreover, Petitioner cannot demonstrate that he was prejudiced

by the admission of this testimony, as there existed an overwhelming amount of other evidence supporting Petitioner's conviction. Thus, this claim raises no issue on which habeas relief may be granted.

Petitioner also appears to assert that the admission of this testimony violated his Confrontation Clause rights. Respondent asserts that Petitioner's claim must be denied because it has not been properly exhausted and has since been defaulted. The Court need not determine, however, whether this claim has been properly exhausted as it is without merit. *See* 28 U.S.C. § 2254(b)(2) (recognizing that a claim "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

The Confrontation Clause of the Sixth Amendment, applied to the states through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 403-05 (1965), guarantees to every criminal defendant the right "to be confronted with the witnesses against him." *Cruz v. New York*, 481 U.S. 186, 189 (1987). This right entitles the accused to see the witnesses against him face-to-face, and to hear their testimony. *See Dowdell v. United States*, 221 U.S. 325, 329-30 (1911) (adequate confrontation requires that the accused have the opportunity to see the witnesses against him face-to-face at trial).[5]

The Confrontation Clause insures that each witness "will give his statements under oath - thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." *Lee v. Illinois*, 476 U.S. 530, 540 (1986). It also permits the jury to observe the witnesses, enabling them to judge by their demeanor on the stand whether they

---

[5]   The Supreme Court has recognized a very limited exception to the requirement of physical, face-to-face, confrontation. *See Maryland v. Craig*, 497 U.S. 836 (1990) (remote testimony by child assault victim, using closed circuit video monitor, is acceptable if the child would suffer trauma as a result of face-to-face confrontation).

are worthy of belief. *See Mattox v. United States*, 156 U.S. 237, 242-43 (1895). The primary right secured by the Confrontation Clause, however, is the right to cross-examine witnesses. *See Ohio v. Roberts*, 448 U.S. 56, 63 (1980). The importance of the right to cross-examine adverse witnesses cannot be overstated. As is well recognized, cross-examination is the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970).

Concern about the right to cross-examine witnesses, however, is not a recent phenomenon. In 1603, Sir Walter Raleigh was prosecuted for conspiring to engage in treason. Lord Cobham, his alleged co-conspirator, directly inculpated Raleigh as the leader of the conspiracy, but never testified at Raleigh's trial. Raleigh denied the charges, demanding that he have the opportunity to confront and question Lord Cobham concerning his alleged statements. Raleigh's request was denied, and he was convicted of treason – and later beheaded. *Id.* at 157 n.10.

The importance of the Confrontation Clause notwithstanding, it cannot be interpreted literally, so as to allow criminal defendants to physically confront and cross-examine every witness against him. To do so would eliminate every exception to the hearsay rule, a result the Supreme Court has repeatedly rejected. *See Roberts*, 448 U.S. at 63. This is not to say, however, that the Confrontation Clause imposes no limitation upon the admissibility of hearsay evidence.

In *Crawford v. Washington*, 541 U.S. 36 (2004),[6] the Court held that the admission of testimonial statements by an out-of-court declarant violates the Confrontation Clause unless the

---

[6] The *Crawford* decision was issued March 8, 2004, more than two years after the conclusion of Petitioner's trial. The question, therefore, becomes the extent to which *Crawford* is to be applied retroactively. *Crawford* was decided following the decision by the Michigan Court of Appeals affirming Petitioner's conviction on direct appeal, but before the decision by the Michigan Supreme Court denying Petitioner's request for leave to appeal that decision. The Supreme Court has indicated that *Crawford* announced a "new rule" of constitutional law. *See Whorton v. Bockting*, 549 U.S. 406, 416 (2007). As such, *Crawford* applies retroactively "only to cases [that were] still on direct review" as of the date it issued. *Id.* Accordingly, because Petitioner's case was still on direct review when *Crawford* was decided, the rule announced in *Crawford* applies in this matter.

declarant is unavailable to testify and the defendant previously had the opportunity to cross-examine

the declarant. *Id.* at 42-69. However, as the Supreme Court subsequently observed:

> A critical portion of this holding. . .is the phrase "testimonial
> statements." Only statements of this sort cause the declarant to be a
> "witness" within the meaning of the Confrontation Clause. It is the
> testimonial character of the statement that separates it from other
> hearsay that, while subject to traditional limitations upon hearsay
> evidence, is not subject to the Confrontation Clause.

*Davis v. Washington*, 547 U.S. 813, 821 (2006).

The Supreme Court has neither articulated an all-encompassing definition of

"testimonial statements," nor attempted to identify all the types of statements that qualify as

"testimonial." As the *Crawford* Court stated:

> We leave for another day any effort to spell out a comprehensive
> definition of "testimonial." Whatever else the term covers, it applies
> at a minimum to prior testimony at a preliminary hearing, before a
> grand jury, or at a former trial; and to police interrogations. These are
> the modern practices with closest kinship to the abuses at which the
> Confrontation Clause was directed.

*Crawford*, 541 U.S. at 68.

The Court has since indicated that while statements made during a police

interrogation, the purpose of which is "to establish or prove past events potentially relevant to later

criminal prosecution," are testimonial in nature, statements "made in the course of police

interrogation under circumstances objectively indicating that the primary purpose of the interrogation

is to enable police assistance to meet an ongoing emergency" are "nontestimonial." *Davis*, 547 U.S.

at 822.

The statements presently at issue do not consist of prior testimony and were not made

in the course of a police investigation. Thus, they do not fall into any of the aforementioned

categories of "testimonial statements." Rather, the statements in question were made to ordinary citizens who were neither acting with nor as agents of law enforcement. There exists no clearly established Supreme Court authority that the statements in question fall within the purview of the Confrontation Clause. Moreover, there exists persuasive authority that the challenged testimony does not constitute "testimonial statements" and, therefore, its admission does not implicate Petitioner's Confrontation Clause rights.

In *Crawford*, the Court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51. In *Giles v. California*, 128 S.Ct. 2678 (2008), the Court, albeit in dicta, observed that "[s]tatements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules" because such are not testimonial within the meaning of the Confrontation Clause. *Id.* at 2692-93. The Sixth Circuit, relying in part on this authority, subsequently held that statements of the type presently at issue did not implicate the Confrontation Clause.

In *Doan v. Carter*, 548 F.3d 449 (6th Cir. 2008), Doan was convicted of kidnapping and murdering his girlfriend, Carrie Culberson. *Id.* at 453. At Doan's trial, several witnesses testified that:

> on many occasions in the months prior to Culberson's disappearance, Culberson had described to them physical abuse by Doan, and threats that Doan had made on her life and the lives of her family members. Witnesses testified that Culberson had told them that Doan had punched her, dragged her through a bedroom, smashed her face into a steering wheel, held her by the hair after kicking out the window of a car in which she was riding, and picked her up and slammed her

32

against a car trunk.

*Id.* at 454.

Doan asserted that the trial court violated his rights under the Confrontation Clause "by allowing Culberson's friends and family to testify as to statements made to them by Culberson concerning alleged physical abuse by Doan." *Id.* at 457. The court disagreed, concluding, after discussing the Supreme Court authority identified above, that "[c]onsistent with *Giles*, *Crawford*, and *Davis*, we find that Culberson's 'statements to friends and neighbors about abuse and intimidation' allegedly inflicted by Doan are nontestimonial statements and are not subject to the Confrontation Clause." *Id.* at 458.

The testimony to which Petitioner objects, statements by Ladena Wilson to lay witnesses concerning Petitioner's violence against her, is indistinguishable in substance from the statements at issue in *Doan*. The Court finds, therefore, that admission of testimony by Fredrick Thomas, Robert Baskin, Willie Martin, and Cheryl Huberts concerning statements by Ladena Wilson identifying Petitioner as her assailant do not constitute "testimonial statements" under the Confrontation Clause. Petitioner's Confrontation Clause rights were, therefore, not violated. Accordingly, this particular claim is without merit.


III.         **Proportionality of Petitioner's Sentence**

Finally, Petitioner asserts that his sentence violates the principle of proportionality articulated by the Michigan Supreme Court in *People v. Milbourn*, 461 N.W.2d 1 (Mich. 1990). The Sixth Circuit has observed, however, that because the United States Constitution "contains no strict proportionality guarantee," a claim that the sentencing court violated Michigan's principles of

proportionality is not cognizable on federal habeas review. *Lunsford v. Hofbauer*, 1995 WL 236677 at *2 (6th Cir., April 21, 1995) (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991)); *McLemore v. Berghuis*, 2006 WL 2818799 at *24 (W.D. Mich., Oct. 2, 2006).

Moreover, the Eighth Amendment to the United States Constitution "does not require strict proportionality between crime and sentence." *United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (quoting *Harmelin*, 501 U.S. at 1001). Instead, the Eighth Amendment simply forbids extreme sentences that are "grossly disproportionate" to the crime committed. *Layne*, 324 F.3d at 473. When a court assesses whether a sentence imposed by a state court satisfies the Eighth Amendment's "limited guarantee of proportionality," it must "grant substantial deference to the. . .legislatures. . .in determining the types and limits of punishments for crimes." *Id.* at 473-74. Accordingly, "a sentence within the maximum set by statute generally does not constitute cruel and unusual punishment." *Id.* at 474.

Michigan law in effect as of June 2002, provided that second degree murder "shall be punished by imprisonment. . .for life, or any term of years, in the discretion of the court." Mich. Comp. Laws § 750.317 (1992). Petitioner's sentence is consistent with Michigan law and is in no way "grossly disproportionate" to the crime committed. Accordingly, this claim presents no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Wilson's petition for writ of habeas corpus be **denied**. The

34

undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: October 4, 2010          /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge